IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

|  |  |  |
|---|---|---|
| **WILLIAM FRANKLIN CROUCH** | ) | |
| Plaintiff | ) | Case No. 5:18-CV-643-JMH |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| **EQUIFAX INFORMATION SERVICES** | ) | |
| **LLC.,** *et al.* | ) | |
| Defendants. | ) | |

**Reply Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment**

INTRODUCTION

In his Main Brief Mr. Crouch argued:

1) The undisputed facts demonstrate that Defendant The Citizen Bank ("Bank") violated the Equal Credit Opportunity Act ("ECOA") by accepting a credit application from Mr. Crouch, denying him credit, and then failing to send him a written notice explaining its adverse action within 30 days of his application as required by 15 U.S.C. § 1691(d).

2) The Bank's defense of "inadvertent error" is not tenable as a matter of law, following the express admission by its personnel that it did not maintain "procedures reasonably adapted to avoid such errors" as required by Regulation B, 12 C.F.R. §§ 1002.9 and 1002.2(s).

3) Therefore, the Court should grant partial summary judgment in favor of Mr. Crouch on the issue of liability.

In its memorandum opposing summary judgment the Bank makes the following arguments:

1

A. Contrary to the deposition testimony of its personnel, the Bank *does* have "procedures regarding adverse action notices." The Court should therefore conduct a "fact-intensive inquiry" rather than granting summary judgment. (Doc. # 36, Bank Memo., pp. 10-11)

B. In addition, Mr. Crouch is not entitled to summary judgment because his claim does not "pass the smell test." This is true because:

1. He "knew about the erroneous information listed on his credit report prior to applying for credit" with the Bank. (*Id.*, p. 12)

2. He "failed to produce any evidence that [the Bank's] actions caused him any embarrassment, humiliation, nor [*sic*] mental distress other than mere supposition." (*Id.*)

3. He can "identify no actual out-of-pocket damages." (*Id.*)

4. "His credit application would have been rejected by [the Bank] regardless of when [the Bank] mailed the written adverse action notice and regardless of whether his hand-written application was shredded."[1] (*Id.*, p. 13)

5. He "intentionally and fraudulently misrepresented himself" in applying for a loan. (*Id.*)

C. Finally, partial summary judgment is improper "without [the Bank] being allowed to undertake proper discovery," including deposing Mr. Crouch "regarding his conduct and true intentions." (*Id.*, p. 13)

Mr. Crouch will respond to these arguments in the same order.

---

[1] As far as Mr. Crouch can tell, there is no document-destruction issue before the Court, as Mr. Crouch does not assert the Bank's shredding of his application as an element of liability. He has therefore ignored this point in his memorandum.

**ARGUMENT**

 A. <u>THE BANK HAS NOT IDENTIFIED ANY PROCEDURE WHICH IT MAINTAINED TO AVOID THE VIOLATION IN QUESTION; THEREFORE, IT CANNOT CONTEST SUMMARY JUDGMENT ON THE BASIS OF INADVERTENT ERROR.</u>

Counsel for Mr. Crouch have found no ECOA case law interpreting the "procedures" requirement of Regulation B. However, the identical language regarding the maintenance of procedures appears in the bona fide error provisions of both the Truth in Lending Act ["TILA"], 15 U.S.C. § 1640(c), and the Fair Debt Collection Practices Act ["FDCPA"], 15 U.S.C. § 1692(k)(c). The Supreme Court has made it clear that when a law uses language from prior legislation, courts should interpret that language in a consistent manner. For example, in *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 130 S. Ct. 1605 (2010), the Supreme Court held:

> Any remaining doubt about the proper interpretation of § 1692k(c) [the FDCPA bona fide error provision] is dispelled by evidence of the meaning attached to the language Congress copied into the FDCPA's bona fide error defense from a parallel provision in an existing statute. TILA, 82 Stat. 146, was the first of several statutes collectively known as the Consumer Credit Protection Act (CCPA) that now include the FDCPA [and the ECOA].[2] As enacted in 1968, § 130(c) of TILA provided an affirmative defense that was in pertinent part identical to the provision Congress later enacted into the FDCPA: "A creditor may not be held liable in any action brought under [TILA] if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."…
>
> We have often observed that when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its ... judicial interpretations as well.

---

[2] See *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir. 1998).

559 U.S. at 588–90, 130 S. Ct. at 1615–16 (footnotes, internal quotation marks, and some citations omitted); see *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 2202 (1998), where the Court held: "The ADA's definition of disability is drawn almost verbatim from the definition of "handicapped individual" included in the Rehabilitation Act of 1973,… and the definition of "handicap" contained in the Fair Housing Amendments Act of 1988.… Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations."

Using this principle, we turn to the interpretation of "procedures" in the consumer statutes enacted prior to the 1985 Regulation which added the language in question to the ECOA.[3] See Vol. 50, No. 224, Fed. Reg., p. 48028 (11/20/85).[4] A good example is *Mirabal v. Gen. Motors Acceptance Corp.*, 537 F.2d 871 (7th Cir. 1976), overruled on other grounds, *Brown v. Marquette Sav. & Loan Ass'n*, 686 F.2d 608, 615 (7th Cir.1982). In this TILA case, the defendants' procedures for catching the error in question were as follows:

1. "Defendant dealer had specially trained office personnel to assist salesmen in determining annual percentage rates for instalment contracts."

2. "Those office personnel had been trained in the preparation of Truth in Lending disclosure statements at educational meetings that defendant GMAC held with each GM dealer before the Act went into effect."

---

[3] Prior to 1985, Regulation B contained different language. See *Carroll v. Exxon Co., U.S.A.*, 434 F. Supp. 557, 562–63 (E.D. La. 1977): "Exxon's reliance on the defense propounded at 12 CFR 202.11(a) is inapposite. That section provides that, if a creditor fails to comply with 202.5(m) due to a 'mechanical, electronic or clerical error made in good faith,' it shall not be a violation of the section if 'the creditor shows by a preponderance of the evidence that at the time of the noncompliance the creditor had established and was maintaining suitable procedures to assure compliance with the section.'"

[4] Such a Regulation has the force of law. See *Raymond v. United States*, 983 F.2d 63, 66 (6th Cir. 1993) ("As a longstanding regulation which has not substantially changed, the Treasury regulation has the force of law, because Congress did not alter the regulation's approach when it amended the statute in 1979 by adding § 6343(c), which authorizes the payment of interest on returned property.").

      3. "At these meetings, GMAC used a chart easel presentation to explain full disclosure, the new type of contracts, the establishment of rates, and how to arrive at rates."

      4. "GMAC held classes at the premises of every one of the 48 GM dealers in the area in June 1969 to prepare the dealers to work under the Act."

      5. "In addition, GMAC sent to all General Motors dealers materials and a form of contract designed to aid compliance under the Truth in Lending Act. These materials included rate charts and tables which were less awkward to use than those provided by the Federal Reserve Board. GMAC prepared these materials after extensive consultation with the Federal Reserve Board and Federal Trade Commission."

      6. "A manual sent by GMAC to all GM dealers emphasized the need for the accurate statement of annual percentage rates …."

537 F.2d at 877.

In holding these procedures to be sufficient, the Seventh Circuit first noted that "Congress had no intention of having the consumer bear the burden of a creditor's negligence. As was noted in the Senate hearings on the Act, the philosophy behind its passage was not 'let the buyer beware' but 'let the seller make full disclosure.'"

As to error catching, the Court continued: "[T]he provision for our purposes has basically two requirements, that the error be a bona fide error and that the creditor maintain procedures reasonably adapted to avoid such errors.… [T]he statute requires a higher burden than merely good faith compliance. In other words, Congress required more than just the maintenance of procedures which were designed to provide proper disclosure calculations. *Rather, it required*

*procedures designed to avoid and prevent the errors which might slip through procedures aimed [merely] at good faith compliance. This means that the procedures which Congress had in mind were to contain an extra preventative step, a safety catch or a rechecking mechanism.*" *Id*. at 878 (emphasis added). Congress also required "that these procedures be maintained. *This means that the creditor must show that the proper procedures were followed time in and time out.…*" *Id.* at 879 (emphasis added; footnotes omitted).

Pre-ECOA cases unanimously followed *Mirabal* in protecting consumers from defenses based upon "error" absent employee training and specific, clear procedures designed to catch the very error about which the consumer was complaining in that lawsuit. *E.g.*, *Teel v. Thorp Credit Inc. of Illinois*, 609 F.2d 1268, 1270 (7th Cir. 1979) (TILA case: "But neither the manager nor the secretary testified satisfactorily to the institution and maintenance of careful checking and rechecking of the loan documents for this specific type of error."); *Gallegos v. Stokes*, 593 F.2d 372, 376 (10th Cir. 1979) (TILA case: "The [trial] court found that Stokes calculated the finance charge, annual percentage rate, amount and number of monthly payments only once, and did not recompute or review his figures; that he had no preventive mechanism for catching errors. Stokes does not fall within the good faith exception of § 1640(c)."); *Thomka v. A. Z. Chevrolet, Inc.*, 619 F.2d 246, 251 (3d Cir. 1980) (TILA case: "The requirement has been construed strictly by the courts to require that a special system be established to assure that no initial errors occur, and that a checking mechanism be maintained to catch any errors that slip through the system.… In this case, AZ offered no evidence that it took any precautions to avoid errors."); *Turner v. Firestone Tire & Rubber Co.*, 537 F.2d 1296, 1298 (5th Cir. 1976) (TILA case: "The statute clearly places this burden on the defendant creditor. Even if it were noted that this type of mistake is the typical clerical error at which the statute was aimed, the defendant has not

6

produced any evidence or even pleaded that defendant Firestone has any 'procedure reasonably adapted to avoid any such error.'"); *Carroll v. Exxon Co., U.S.A.*, 434 F. Supp. 557, 561 (E.D. La. 1977) (Fair Credit Reporting Act case: "In the instant case, defendant has produced no evidence to show that its compliance procedures, although probably designed to provide the proper information, contained any type of preventative mechanism for catching errors."); *Brown v. Nat'l Permanent Fed. Sav. & Loan Ass'n*, 526 F. Supp. 815, 822 (D.D.C. 1981), aff'd in part, remanded in part, 683 F.2d 444 (D.C. Cir. 1982) (TILA case: "[P]rocedures 'reasonably adapted to avoid' error would include using a printed form that encouraged rather than obstructed the making of the proper disclosures."). Thus, the law prior to 1985 was clear, and there is no indication that either Congress or the Federal Reserve Board intended to change the law when it enacted the same language into the ECOA.

Many post-1985 cases also demonstrate – unanimously – that compliance with the procedures requirement should include a manual of procedures, careful checking, and continuing instructions to employees, as in *Mirabal*, *supra*. For example, the Sixth Circuit in *Smith v. Transworld Sys., Inc.*, 953 F.2d 1025 (6th Cir. 1992), a five-page instruction manual, uncontested by the FDCPA defendant, was sufficient to qualify as a procedure "reasonably adapted to avoid any such error," the error being the sending of a collection letter after receiving a cease-and-desist letter. *Id.* at 1031.

Similarly, in *Jenkins v. Heintz*, 124 F.3d 824 (7th Cir.1997), on remand from *Heintz v. Jenkins*, 514 U.S. 291, 115 S.Ct. 1489 (1995), the Seventh Circuit held that a debt collector satisfied the burden imposed by the bona fide error defense of the FDCPA when its procedures included a requirement that the creditor verify under oath that each charge was accurate; "an in-house fair debt compliance manual, updated regularly and supplied to each firm employee;

training seminars for firm employees collecting consumer debts; and an eight-step, highly detailed pre-litigation review process to ensure accuracy and to review the work of firm employees to avoid violating the Act." *Id*. at 834; accord, *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1006 (9th Cir. 2008) (specifically citing this passage as illustrative of "the type of evidence of procedures that has been held to be sufficient").

Another example may be found in *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263 (11th Cir. 2011), relied upon by the Bank (Memo., p. 10). There the Eleventh Circuit considered the bona fide error defense of a debt collector which had erroneously charged compound interest and other illegal fees. The Court dismissed the defense because the debt collector "has not indicated any internal, error-correction procedures to avoid miscalculations of debt amounts …. [In addition, the debt collector] has not offered evidence of any training techniques it employs to foster FDCPA compliance.…" *Id.* at 1276.

In addition to these more recent cases from the Sixth, Seventh, Ninth, and Eleventh Circuits,[5] this Court's decision in *Allen v. Checkredi of Kentucky, LLC*, 2010 WL 4791947 (E.D. Ky.), is also instructive. In that case, Judge Bunning considered the procedures provision of the

---

[5] A number of state courts came to similar conclusions before the ECOA provision came into force, regarding identical state-law inadvertent-error provisions. *E.g.*, *Seitz v. Lamar Sav. Ass'n*, 618 S.W.2d 142, 146 (Tex. Civ. App. 1981) ("We hold … that there is insufficient evidence in the record that appellee maintained an 'extra preventive step, a safety catch or a rechecking mechanism ...' designed to avoid the statutory violation of charging usury," quoting *Mirabal*, *supra*.); *Ellis v. Hensley*, 1979 WL 52452, p. *5 (Ohio Ct. App. Aug. 16, 1979) ("Even if it were shown that these were merely mathematical or clerical errors, it must still be shown that there is a system for detecting these errors that failed to catch the errors [which the defendant did not show]," citing *Mirabal*.); *First Fed. Sav. & Loan Ass'n of San Antonio v. Bustamante*, 609 S.W.2d 845, 848 (Tex. Civ. App. 1980) ("We have in this case no summary judgment evidence which indicates that defendant had adopted any procedures reasonably calculated to avoid the violation in question. To take advantage of this defense, a creditor must show that procedures have been adopted which are designed to avoid and prevent the errors," citing *Mirabal*.). Counsel have found no contrary cases.

FDCPA. In rejecting the debt collector's defense, the Court stated: "… Defendant offers no evidence of procedures (reasonable or otherwise) to avoid the specific errors in this case …." Citing *Jerman*, *supra*, in its Sixth Circuit (pre-Supreme Court) iteration, Judge Bunning noted that "Defendant's procedures are substantially less comprehensive and structured than the procedures other courts have endorsed as 'reasonable.' In *Jerman*, the Sixth Court determined that defendant law firm's procedures were reasonable. 538 F.3d at 477.… There, the law firm designated its senior principal to be responsible for ensuring compliance with the FDCPA. *Id*. In that capacity, the principal attended conferences and seminars, subscribed to trade publications, distributed relevant cases to the attorneys, provided all employees (attorneys and non-attorneys) with the firm's FDCPA Procedures Manual, and conducted a mandatory meeting discussing FDCPA developments at least twice a year. *Id*. Defendant Checkredi has none of these procedures." 2010 WL 4791947 at *13.

In another decision from this Court, Judge Reeves reiterated the type of procedures indicated by FDCPA case law: "[A]Training Manual indicates that PRA employees complete a two-week program concerning the FDCPA and state collections law compliance.… Further, collectors must complete a mandatory assessment and an 'Annual FDCPA Recertification Assessment.'… Additionally, the Training Manual includes information on calculating interest." *Stratton v. Portfolio Recovery Assocs., LLC*, 171 F. Supp. 3d 585, 603–04 (E.D. Ky. 2016), aff'd, 706 F. App'x 840 (6th Cir. 2017).

Finally, in *Jerman v. Carlisle, supra*, the Supreme Court noted that, regarding the FDCPA provision, "[t]he dictionary defines 'procedure' as '*a series of steps followed in a regular orderly definite way*.' " 559 U.S. at 587 (citing WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY 1807 (1976)). It is instructive to keep this definition in mind when reviewing the Bank's legal position.

In the face of this unanimous case law, the Bank has not provided the Court with a single example of its written procedures, let alone a comprehensive manual of the type described above. It mentions no "series of steps." Instead, it contents itself with citing *Owen*, *supra*, for the proposition that there is "no definitive list of procedures," failing to note that in *Owen* the Eleventh Circuit *rejected* the offered defense because the collector could not indicate "any internal procedures to avoid the error in question, and did not offer evidence of any training techniques used to promote FDCPA compliance.…" *Id.* at 1276. The only evidence the Bank presents is the general assertions that "we have a procedure," we "subject employees to training," and we "hire competent and qualified individuals." (Doc. # 36, Bank Memo., pages 11-12) Counsel for Mr. Crouch have not found a single case in which such bare assertions, *without any mention of how the creditor avoids the error in question*, was held sufficient to support this defense.

Moreover, the Bank's affidavits contradict the earlier deposition testimony of the same Bank witnesses and are therefore without force. Sam Wright, business development officer for the Bank, was deposed on March 7, 2019. After a review of the error which is the subject of this lawsuit he was asked, "Do you have a procedure in place to prevent this kind of error from happening?" He responded, "I don't know of any procedure to prevent errors from happening, no." He went on, "I don't know of any procedure to prevent adverse action notice errors." (Doc. # 33-3, Depo. of Sam Wright, filed 4/22/19, p. 99)

Ryan Neff, the vice president of the bank, was deposed on April 11, 2019, as the Bank's designated officer pursuant to Rule 30(b)(6), Fed.R.Civ.P. As such he was asked whether he

10

agreed with Mr. Wright's deposition testimony. The vice president responded, "We do not have a procedure that would necessarily prevent this from have [sic] happening.… We do not have a formal policy on that; that's is [sic] correct." (Doc # 33-4, Depo. of Ryan Neff, filed 4/22/19, pp. 30-31)[6]

By May 9 of the same year, both of these deponents had attempted to disavow their earlier sworn testimony by filing contrary affidavits. This time they said the Bank *did* have such a procedure in place, although they could not describe it. However, the law in this Circuit is clear: "[A] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997). And this Court has followed the same rule many times. *E.g.*, *BDT Prod., Inc. v. Lexmark Int'l, Inc.*, 274 F.Supp.2d 880, 898 (E.D. Ky. 2003; Hood, J.), aff'd, 124 F. App'x 329 (6th Cir. 2005) ("To be sure, Plaintiffs have the right to amend their complaint and to argue alternative legal theories. They do not, however, have the right to amend their sworn testimony so as to create a genuine issue of fact.").

Clearly, the Bank must be held to the original sworn testimony of its own personnel, namely, that it maintained no procedures whatsoever to avoid the error of failing to send an adverse action letter. Moreover, even if permitted to change its position, its later testimony would be insufficient: 12 C.F.R. § 1002.2(s) requires that the procedures be "*reasonably adapted to avoid such errors*" whereas the later affidavits only assert that the Bank has "procedures regarding adverse action notices." (See Doc. # 36, Bank Memo., pp. 10-11)

---

[6] Despite the Bank's testimony citations on page 11 of its Memorandum, Mr. Crouch is not arguing that the Bank has no policy of *sending* adverse action notices. The only issue here is whether it has procedures consisting of "a series of steps followed in a regular orderly definite way," see *Jerman, supra, to catch its error*, namely, its *failure* to send the notice.

11

For the above reasons, the Bank cannot avoid summary judgment by invoking the inadvertent error defense.

### B. THE ECOA DOES NOT PROVIDE FOR A "SMELL-TEST" DEFENSE.

The Bank does not supply a single citation to back up its claim that it can avoid liability for its conceded violation of the ECOA by invoking a "smell test." Counsel's research has also failed to discover any authority for this proposition. Mr. Crouch will therefore respond to each of the elements of this nonexistent "test" separately, without presenting any olfactory conclusions.

1) The Bank claims a defense based upon its assertion that Mr. Crouch "knew about the erroneous information listed on his credit report prior to applying for credit." (Doc. # 36, Bank Memo., p. 12)[7] The problem with this "defense" is that nowhere in the ECOA did Congress mention any inquiry into the knowledge or other mental state of the consumer-applicant who is seeking relief under the Act.

Perhaps the Bank is contending that, once a consumer discovers false information on a credit report, he or she should refrain from seeking credit for fear of waiving rights under various consumer protection statutes. While it is possible that Congress will someday embrace this position, it has not yet done so. In other words, the Bank's "prior knowledge" defense is unsupported in the law.

2) The Bank's second argument asserts that Mr. Crouch "failed to produce any evidence that [the Bank's] actions cost him any embarrassment, humiliation, nor [*sic*] mental distress other

---

[7] As Mr. Crouch states in his declaration, he knew from looking at his Equifax report "that Equifax was merging my consumer file information with another consumer who had filed Bankruptcy…." (Doc. # 33-2, Declaration of Plaintiff, filed 4/22/19, p. 1)

than mere supposition."[8] To the contrary, Mr. Crouch has done all that is necessary regarding damages at this stage of the litigation.

Several federal appellate courts have discussed the nature of ECOA damages. In *Anderson v. United Fin. Co.*, 666 F.2d 1274 (9th Cir. 1982), the Ninth Circuit observed:

> The first type of relief available to appellant under the ECOA is actual damages.… 15 U.S.C. § 1691e(a) (1976). *Actual damages may include out-of-pocket monetary losses, injury to credit reputation, and mental anguish, humiliation or embarrassment*.…
>
> The second type of relief available to appellant under the ECOA is punitive damages. The Act states that any creditor "who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000, in addition to any actual damages provided in subsection (a) of this section ...." 15 U.S.C. § 1691e(b) (1976).…[P]unitive damages may be awarded even absent a showing of any actual damages.

666 F.2d at 1277–78 (emphasis added); accord, *Fischl v. Gen. Motors Acceptance Corp.*, 708 F.2d 143, 148 (5th Cir. 1983); *Sayers v. Gen. Motors Acceptance Corp.*, 522 F. Supp. 835, 841 (W.D. Mo. 1981) ("The ECOA has been interpreted to provide compensation for embarrassment, humiliation and mental distress, *Shuman v. Standard Oil Co.*, 453 F.Supp. 1150 (N.D. Cal.1978), and this type of emotional harm is properly considered as an element of actual damage even though it does not represent out-of-pocket loss."); cf. *RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380, 384 (6th Cir. 2014) ("Creditors who violate ECOA or Regulation B may be sued for actual damages, punitive damages, and attorneys' fees.").

In keeping with these decisions, Mr. Crouch has set forth his damages in his sworn declaration, unopposed by the Bank, stating that the Bank's treatment of him throughout the loan process "caused me a great amount of anxiety, frustration, anger, and embarrassment." (Doc. # 33-2, p. 4) In addition, when and if damages are put to the proof, it will be clear that the Bank's

---

[8] Mr. Crouch reiterates that his Motion for Partial Summary Judgment does not request a ruling on damages. (See Doc. # 33, filed 4/22/19, p. 1)

conduct placed Mr. Crouch in a position of being unable to understand the Bank's credit standards and the reasons for rejection, making it that much harder for him to obtain credit. The Bank's conduct also put him into the position of having to file a lawsuit in order to get the information due him under the law. This is a good part of what the ECOA was enacted to prevent.

Since nothing in the Bank's memorandum controverts Mr. Crouch's position, the Court should reject this defense.

3) The Bank's argument concerning "no actual out-of-pocket damages" (Doc. # 36, Bank Memo., p. 12) is answered by *Anderson*, the Ninth Circuit case quoted above: "Actual damages may include out-of-pocket monetary losses, injury to credit reputation, and mental anguish, humiliation or embarrassment …." In other words, the absence of an identifiable dollar loss does not eliminate other types of actual damages. The bank has not provided any contrary authority.

4) The Bank next argues that Mr. Crouch's case is barred because his credit application would have been rejected in any event. *Id*. The problem with this is the same as the problem with the Bank's first argument in Part B – the ECOA simply does not provide such a defense. It requires creditors to act in a certain manner, and, if they do not do so, it provides for liability and damages in favor of the applicant for credit. It does not limit its coverage to those who successfully obtain loans. See 15 S.C. § 1691a(b).[9]

5) The Bank's memorandum does not elaborate on its fraudulent misrepresentation defense, which presumably relates to the Bank's interpretation of Mr. Crouch's "purpose in applying for credit." *Id*. at 13. It does not state how it relied on any identifiable falsehoods presented by Mr. Crouch. Neither does it purport to state a claim against Mr. Crouch for

---

[9] "The term 'applicant' means *any person* who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." (Emphasis added.)

fraudulent misrepresentation under Kentucky law, which would require a counterclaim, an allegation of reliance, some showing of damage causation, and proof of the other elements of such a tort. Since the Bank has not explained how its generalized fraud allegation would prevent summary judgment in this federal case, the Court should disregard this defense.

C. <u>HAVING PREVIOUSLY FAILED TO SEEK WRITTEN DISCOVERY, HAVING CURRENTLY FAILED TO NOTICE MR. CROUCH'S DEPOSITION, AND HAVING FAILED TO FILE A MOTION UNDER CIVIL RULE 56(d), THE BANK CANNOT NOW AVOID SUMMARY JUDGMENT ON THE GROUND THAT IT NEEDS ADDITIONAL DISCOVERY.</u>

Mr. Crouch filed this action on December 12, 2018. The Bank never noticed his deposition. Even after he filed this motion on April 22, 2019, the Bank did not attempt to depose him.

Civil Rule 56(d) provides: "When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." While a party's failure to file such an affidavit or declaration does not *automatically* waive its right to a postponement, the rule in this Circuit is clear:

> [A] par yes it's a ty opposing a motion for summary judgment *must "indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." Unan v. Lyon*, 853 F.3d 279, 292-93 (6th Cir. 2017) (quoting *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000))…. In other words, [even] "if a party does not satisfy Rule 56(d)'s technical requirements, he must at least affirmatively demonstrate that the discovery sought would enable him to adequately oppose the motion for summary judgment."…

*Arla v. Liberty Mut. Grp., Inc.*, 715 F. App'x 517, 518 (6th Cir. 2018) (some citations omitted).

Rather than follow established Sixth Circuit procedure, the Bank responded to Mr. Crouch's motion with affidavits contra and a memorandum of law. At the end of its argument it inserts a brief afterthought – it needs "to undertake proper discovery." Its only reason for this is

15

that it hopes to find out something about Mr. Crouch's "conduct and true intentions when applying for credit as well as certain overt attempts to force a settlement through maliciously filing a complaint against [the Bank] with the Kentucky Department of Financial Institutions." It does not say how either of these matters has anything to do with the only viable issue before the Court – the sufficiency of the Bank's internal procedures to catch errors. Mr. Crouch obviously has no information to convey on that subject.

The Bank also fails to explain why it has so far failed to depose Mr. Crouch, as required by *Arla*, *supra*. Therefore, pursuant to Sixth Circuit rules, the Bank has waived its prematurity argument. There is thus no rational reason for delay.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment should be granted.

                                            Respectfully submitted

                                            ***/s/Steven C. Shane***
                                            Steven C. Shane (Ohio Bar #0041124)
                                            Trial Attorney for Plaintiff
                                            P.O. Box 73067
                                            Bellevue, Ky. 41073
                                            (859) 431-7800
                                            (859) 431-3100 facsimile

and

*s/ Justin M. Baxter*
Justin M. Baxter, *admitted pro hac vice*
Baxter & Baxter, LLP
8835 SW Canyon Lane,
Suite 130
Portland, OR 97225
Telephone: 503-297-9031
Facsimile: 503-291-9172
Email: justin@baxterlaw.com

**CERTIFICATE OF SERVICE**

    I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/Steven C. Shane*
